# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO

## WESTERN DIVISION

|  |  |
|---|---|
| SPENCER LIN and JEAN LIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) |
|  | CIVIL ACTION NO. 1:07-cv-816 |
| Plaintiffs, | ) ) Judge Spiegel |
| vs. | ) ) |
|  | CLASS ACTION COMPLAINT |
| LCA-VISION INC., E. ANTHONY WOODS, STEVEN C. STRAUS, ALAN H. BUCKEY, and CRAIG P. R. JOFFE, | ) ) ) JURY TRIAL DEMANDED |
| Defendants. | ) ) ) |

Plaintiffs, Spencer Lin and Jean Lin ("Plaintiffs"), allege the following based upon the investigation by Plaintiffs' counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LCA-Vision Inc. ("LCA" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of LCA's securities between February 12, 2007 and July 30, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    LCA is engaged in the provision of fixed-site laser vision correction services at its LasikPlus vision centers.  The Company's vision centers provide the staff, facilities, equipment and support services for performing laser vision correction that employ laser technologies to help correct nearsightedness, farsightedness and astigmatism.

3.    On July 31, 2007, the Company shocked investors when it issued a press release entitled "LCA-Vision Reports 16% Revenue Growth for the Second Quarter of 2007; Full-Year 2007 Financial Guidance Revised."  Therein, the Company, in relevant part, stated:

> LCA-Vision Inc. (Nasdaq:LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced financial and operational results for the three months and six months ended June 30, 2007.
>
> **Second Quarter 2007 Financial and Operational Results**
>
> - Revenues increased 16% to $69.7 million from $60.3 million in the second quarter of 2006.
>
> - Procedure volume increased 3% to 48,668 from 47,308 in the second quarter of 2006.
>
> - Net income and earnings per diluted share were $7.4 million and $0.36, compared with $8.0 million and $0.37 in the second quarter of 2006.
>
> * * *
>
> *"In the second quarter of 2007, we reported 16% revenue growth with a modest increase in procedure volume,"* said Steven C. Straus, LCA-Vision's Chief Executive Officer. *"We are not satisfied with our financial and operational results, primarily due to the decline in same-store procedure volume and rising patient acquisition costs.* We expect several factors to re-accelerate earnings and revenue growth in the second half of this year. *Among these, we are implementing a number of major marketing initiatives* that we believe will provide improved performance in the second half of this year and into 2008, with the largest impact expected in the first quarter of 2008."
>
> *"In some of our more established markets, we are remodeling or relocating our LasikPlus vision centers with an aim toward*

*improving same-store performance. So far this year, we have remodeled nine vision centers and have plans to remodel five more, and will relocate two vision centers by the end of this year," added Mr. Straus.* "We also expect to add new managed care provider agreements in the second half of this year. These new provider agreements should drive incremental procedure volume in existing markets and help launch our targeted new markets."

Mr. Straus continued, "Opening new vision centers is a component of our future growth and profitability. During the first six months of 2007, we opened nine LasikPlus vision centers compared with three openings in the first six months of 2006. Earlier this month, we announced the opening of a LasikPlus vision center in Fresno, California. Year-to-date, we have opened 10 new vision centers, which represents a 17% increase in our vision center base since December 31, 2006. We are on track to meet our goal of opening a total of 12 to 15 vision centers this year, and remain focused on strategically expanding the LasikPlus footprint throughout the United States, while continuing to deliver high-quality results to our patients at an affordable price."

**Revenues and Operating Income**

Revenues grew 16% to $69.7 million in 2007's second quarter from $60.3 million in 2006's second quarter. Total procedure volume increased 3% in 2007's second quarter to 48,668 from 47,308 procedures performed in 2006's second quarter. In the second quarter of 2007, same-store procedure volume at vision centers located in the United States decreased by approximately 8% from the second quarter of 2006. *Operating income was $10.0 million in 2007's second quarter compared with $12.4 million in 2006's second quarter. Operating income for the second quarter of 2007 was lower than the second quarter of 2006 primarily as a result of 16 more vision centers in operation as of June 30, 2007, compared with June 30, 2006, and higher marketing expenditures to support new and existing markets.*

**Net Income and Earnings Per Share**

*Second quarter 2007 net income and earnings per diluted share were $7.4 million and $0.36, compared with $8.0 million and $0.37 in the second quarter of 2006.*

\* \* \*

**Outlook**

3

> *LCA-Vision is revising its earnings and revenue guidance for the full-year of 2007. The company now expects earnings per diluted share to be in the range of $1.90 to $2.00, and revenues between $308.0 million to $315.0 million, which includes the impact of deferred revenues. For the third quarter of 2007, marketing spend is expected to be approximately $17.5 million.* [Emphasis added.]

4.     On this news, the Company's shares declined $7.48 per share, or 17.4 percent, to close on July 31, 2007 at $35.51 per share, on unusually heavy trading volume. The following day, the Company's shares declined an additional $2.11 per share, or almost 6 percent, to close on August 1, 2007 at $33.40 per share, again on heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that procedure volume at existing stores had significantly declined; (2) that overall growth was solely coming from new store openings; (3) that the Company was operating under defective assumptions about its marketing budget and deferred revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in a reasonable basis when made.

6.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, LCA's principal executive offices are located within this Judicial District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.    Plaintiffs, Spencer Lin and Jean Lin, as set forth in the accompanying certification, incorporated by reference herein, purchased LCA's securities at artificially inflated prices during the Class Period and have been damaged thereby.

12.    Defendant LCA is a Delaware corporation with its principal executive offices located at 7840 Montgomery Road, Cincinnati, Ohio.

13.    Defendant E. Anthony Woods ("Woods") was, at all relevant times, the Chairman of the Company's Board of Directors.

14.    Defendant Steven C. Straus, ("Straus"), was, at all relevant times, the Company's Chief Executive Officer ("CEO").

15.    Defendant Alan H. Buckey ("Buckey") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President of Finance.

16.    Defendant Craig P. R. Joffe ("Joffe") was, at all relevant times, the Company's

Chief Operating Officer ("COO") General Counsel, and Secretary.

17.     Defendants Woods, Straus, Buckey, and Joffe are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LCA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     LCA is engaged in the provision of fixed-site laser vision correction services at its LasikPlus vision centers.  The Company's vision centers provide the staff, facilities, equipment and support services for performing laser vision correction that employ laser technologies to help correct nearsightedness, farsightedness and astigmatism.

19.     On October 24, 2006, the Company issued a press release entitled "LCA-Vision Grows Revenues 26% and Increases Procedure Volume 24%."  The Company announced that third quarter 2006 revenues grew 26 percent to approximately $59.3 million, that third quarter

2006 same-store revenues at vision centers located in the U.S. increased 6 percent over the third quarter of 2005, that third quarter 2006 procedure volume increased 24 percent, and that third quarter 2006 net income and EPS were approximately $7.2 million and $0.34, respectively, as compared with approximately $7.9 million and $0.37 in the third quarter of 2005. Defendant Joffe, who at the time was the Company's Interim Chief Executive Officer and Chief Operating Officer, stated that while the Company "made changes to our marketing plan throughout the third quarter, the changes did not yield the improvements we expected to realize later in the quarter. We have since identified a number of opportunities in our direct-to-consumer marketing strategies, and are working diligently to adjust the media mix and enhance the message we are delivering to our consumers based on our learnings."

20. On November 22, 2006, the Company announced that it had completed its existing share repurchase plan, and announced a new share repurchase plan and increased its dividend. Defendant Straus, the Company's CEO, stated that "the board's decision to authorize a new share repurchase plan and increase the quarterly dividend by 50% is a reflection of their confidence in the company's financial strength and future growth potential, and also shows their commitment to a balanced cash deployment strategy." Additionally, Defendant Straus stated that the Company believed "the purchase of our common stock represents an attractive opportunity for the company and for shareholders, and is one of the best uses of our substantial cash position," and that the Company was "pleased to reward shareholders with some of the cash flow we are generating from our solid financial performance."

## Materially False and Misleading
## Statements Issued During the Class Period

21. The Class Period begins on February 12, 2007. On this day, the Company issued a press release entitled "LCA-Vision Reports 26% Revenue Growth and 13% EPS Growth for

the Quarter and 34% Revenue Growth and 22% EPS Growth for the Year; Company Expects

2007 EPS of $2.05 to $2.15 and Revenue Growth of 20% to 25%." Therein, the Company, in

relevant part, stated:

> LCA-Vision Inc. (Nasdaq:LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced fourth quarter and full-year financial and operational results for the period ended December 31, 2006.

**Fourth Quarter Financial & Operational Highlights**

- Revenues grew 26% to approximately $58.8 million from approximately $46.8 million.

- Procedure volume increased 23% to 42,049 from 34,225.

- Same-store revenues grew 10%.

- Net income increased 8% to approximately $7.1 million from approximately $6.6 million.

- Earnings per share increased 13% to $0.34 from $0.30.

- Increased the quarterly dividend by 50% to $0.18 per share from $0.12 per share.

- Completed one million share repurchase plan and announced a new $50 million share repurchase plan.

- Successfully opened two new LasikPlus vision centers in Lexington, Kentucky and Lincoln Park, Illinois.

**Full-Year Financial & Operational Highlights**

- Revenues grew 34% to approximately $256.9 million from approximately $192.4 million.

- Procedure volume increased 30% to 185,268 from 142,000.

- Same-store revenue growth averaged 18%.

- Net income increased 21% to approximately $38.3 million from approximately $31.7 million.

- Earnings per share increased 22% to $1.80 from $1.47.

- Successfully opened 10 new LasikPlus vision centers.

Steven C. Straus, LCA-Vision's Chief Executive Officer, commented, "We are pleased to report another year of strong growth for LCA-Vision and LasikPlus. 2006 marks our fourth consecutive year of growth in excess of 30% in revenues, procedure volume and operating income. Our results reflect market share gains in both new and existing markets as well as our continued ability to consistently outperform the industry. We are also pleased with our fourth quarter results. We have operated in a market that has been flat-to-down for the past five quarters, and despite those odds, delivered 13% growth in earnings per diluted share, revenue growth of 26%, and a 23% increase in procedure volume. Growth in same-store revenues accelerated to 10% in the fourth quarter from 6% in the third quarter reflecting growth in word-of-mouth referrals and positive response to some of our new marketing initiatives. Based on industry sources, we believe that our market share in the U.S. grew to an estimated 15% in 2006's fourth quarter from about 12% in 2005's fourth quarter. Since we only operate in 46 U.S. markets, we believe that our market share is well over 30% in most of the markets we serve."

Mr. Straus continued, "In addition to solid financial results, 2006 marked the successful opening of 10 LasikPlus vision centers, and a few weeks ago, we announced the opening of our 60th vision center in Westbury, New York. The positive demand for laser vision correction procedures at our new vision centers continues to exceed our expectations. Our continued investment in growing our center base further strengthens our operations and provides significant opportunity for future growth."

"We are enthused about the growth potential for LCA-Vision/LasikPlus in 2007 and beyond," added Mr. Straus. "We operate in a highly fragmented market and our industry is still in its infancy here in the U.S. with only about 9% of the 60 million people eligible for the laser vision correction procedure treated to-date. The LasikPlus brand is built on high employee and patient satisfaction and superior shareholder returns. Our growth over the past several years reflects the strength of our people and our operations; and as the industry leader, we believe that we are in a strong position to capitalize on this huge market potential."

**Revenues & Operating Income**

Revenues grew 26% to approximately $58.8 million in 2006's fourth quarter from approximately $46.8 million in 2005's fourth quarter. Fourth quarter 2006 same-store revenues at vision centers

located in the Untied States increased 10% over the fourth quarter of 2005. The same-store revenue count includes 49 vision centers. Procedure volume increased 23% in 2006's fourth quarter to 42,049 from 34,225 procedures performed in 2005's fourth quarter. Operating income increased 8% to approximately $9.3 million in 2006's fourth quarter compared with approximately $8.6 million in 2005's fourth quarter.

Revenues grew 34% to approximately $256.9 million in 2006 from approximately $192.4 million in 2005. Same-store revenues averaged 18% over the four quarters of 2006. Procedure volume increased 30% in 2006 to 185,268 from 142,000 procedures performed in 2005. Operating income increased 16% in 2006 to approximately $57.0 million from approximately $48.9 million in 2005.

**Net Income & Earnings Per Share**

Fourth quarter 2006 earnings per diluted share increased 13% to $0.34 from $0.30 in the fourth quarter of 2005. Fourth quarter 2006 net income increased 8% to approximately $7.1 million from approximately $6.6 million in the fourth quarter of 2005.

Full year 2006 earnings per diluted share increased 22% to $1.80 from $1.47 in 2005. Full-year 2006 net income increased 21% to approximately $38.3 million from approximately $31.7 million in 2005.

\* \* \*

**Share Repurchase**

In November 2006, LCA-Vision announced the completion of the share repurchase plan that the board of directors approved in May 2005. Under that plan, the company repurchased one million shares of its common stock at an average price of $38.52 for a total cost of approximately $38.5 million. Also in November 2006, the company announced that the board of directors authorized a new share repurchase plan under which the company was authorized to purchase up to $50 million of its common stock. Through December 31, 2006, the company had repurchased 442,400 shares of its common stock at an average price of $35.06 for a total cost of approximately $15.5 million. The company has repurchased under multiple share repurchase programs over 20% of all shares ever issued.

**Outlook**

> *LCA-Vision currently expects earnings per diluted share for the full-year of 2007 to be in the range of $2.05 to $2.15 with revenue growth between 20% and 25%. As previously disclosed, the company expects to open 12 to 15 new vision centers throughout 2007.* In the first half of 2007, center openings will focus on new markets. After evaluating the results of the additional locations opened last year in Houston, Minneapolis, and Chicago, the company will consider additional locations in existing markets.
>
> "For the first quarter of 2007, we expect marketing spend to be approximately $17.5 million," said Mr. Straus. "We will continue to seek more effective and efficient methods of patient acquisition. We remain committed to growing our industry-leading position in both new and existing markets." [Emphasis added.]

22.     On April 18, 2007, the Company issued a press release entitled "LCA-Vision to Restate Financial Statements to Increase Deferred Revenues for Separately Priced Extended Warranties; Management Comfortable with Current 2007 Financial Guidance." Therein, the Company, in relevant part, stated:

> LCA-Vision Inc. (Nasdaq: LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced *it will restate financial results for 2004, 2005 and 2006 to reflect a change in revenue recognition for the Company's separately priced extended warranties.*
>
> *This change is expected to reduce 2006 revenues and net income by approximately $18 million and $10 million, respectively. This reflects a reduction in revenues of approximately 7 percent for the year. The proposed accounting also is expected to reduce shareholders' equity as of December 31, 2006 by approximately $30 million*, of which approximately $9 million relates to periods prior to 2004. The proposed adjustment in revenue recognition is expected to increase revenues and earnings in future periods as deferred revenues are amortized back into income. There will be no change to cash provided by operating activities or to cash and cash equivalents on the balance sheet for any period affected. *Management is analyzing the restatement adjustments and the estimated changes outlined above are preliminary and are subject to further review and audit.*
>
> *This action resulted from analysis performed following the Company's receipt of a comment letter from the Securities and Exchange Commission (SEC) pursuant to their review of our*

11

**2006 10-K. The single issue raised in this letter addressed the Company's revenue recognition policy.** The Company's historical policy has been to defer revenues for separately priced extended warranties for those patients expected to receive treatment under the warranty. Historical data indicates that only 7% of patients elected to receive treatment under the warranty.

\* \* \*

"We have provided the SEC with a response to its comment letter and we look forward to resolving this issue as soon as is practical," said Steven C. Straus, LCA-Vision's Chief Executive Officer. "Since we started offering separately priced extended vision acuity plans, we have consistently applied our interpretation of the relevant accounting rules and deferred a portion of the revenue from acuity plans consistent with the percentage of patients who return to LasikPlus vision centers for enhancement procedures.

**"We plan to limit or eliminate the use of separately priced extended warranties in the near future," added Mr. Straus. "Therefore, we expect the impact of the restated financial statements will be to increase revenues and pretax income in future periods as the deferred revenue is amortized back into income. At present, we are comfortable with our 2007 revenue guidance growth of 20 to 25 percent compared with 2006, and our 2007 earnings per share guidance of $2.05 to $2.15."**

The Company's decision to restate prior-period financial statements was made by LCA-Vision management with the concurrence of the Audit Committee of its Board of Directors and its independent auditors, Ernst & Young LLP.

In light of the restatement, investors should rely on LCA-Vision's forthcoming restated financial statements and other financial information rather than the previously filed financial statements and other financial information.

\* \* \*

**First Quarter 2007 Financial Results**

The Company will file its Form 10-Q for the first quarter of 2007 with finalized first quarter 2007 financial results as well as its restated financial statements in amendments to prior reports with the Securities and Exchange Commission as soon as it is practical. The final changes to deferred revenues, net income, and earnings per share will be available in these filings.

23.     On May 8, 2007, the Company issued a press release entitled "LCA-Vision Files Restated Financial Results." Therein, the Company, in relevant part, stated:

> LCA-Vision Inc. (Nasdaq: LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced that it has filed with the Securities and Exchange Commission (SEC) an amended Annual Report on Form 10-K/A for the year ended December 31, 2006, including prior period restatements for the years 2002 to 2006. On April 18, 2007, the Company announced that it would file a Form 10-K/A for 2006 that represents the Company's view on changes in revenue recognition for its separately priced extended warranties. The Form 10-K/A is subject to ongoing review by, and possible additional comments from, the staff of the SEC.
>
> The effect of the restatement for 2006 was a reduction in revenues of $18.0 million and a reduction in net income of $9.9 million. The cumulative effect of the restatements for the years through 2006 was a reduction in revenues of $48.9 million and a reduction in retained earnings of $27.4 million.
>
> The table below summarizes the key income statement results of the restatement for the three years ended December 31, 2006, 2005, 2004. There is no change to cash provided by operating activities or to cash and cash equivalents on the balance sheet for any period affected.
>
> * * *
>
> **Reasons for the Restatement**
>
> On March 9, 2007, LCA-Vision received a comment letter from the SEC related to a staff review of its 2006 Annual Report on Form 10-K. The single issue raised in this letter addressed the Company's revenue recognition policy regarding services provided subsequent to the initial surgical procedure. In most cases, LCA-Vision's base price laser vision correction surgery includes a one-year acuity program, which will cover the cost of post-surgical enhancements should the patient not achieve the desired visual correction during the initial procedure. In addition, LCA-Vision offers its patients the option to purchase a lifetime acuity plan. The majority of LCA-Vision patients purchase the lifetime acuity program.
>
> The Company's historical accounting policy had been to defer revenues for separately priced extended warranties for those

patients expected to receive treatment under the warranty. Historical data indicates that approximately 7% of patients received treatment under the warranty. The accounting for separately priced extended warranties is subject to Financial Accounting Standards Board (FASB) Technical Bulletin 90-1 (FTB 90-1), Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts.

Following receipt of the SEC staff comment letter and upon further examination of the manner in which the Company has historically accounted for the revenues associated with the lifetime acuity program, LCA-Vision determined that its accounting for deferred revenues was not appropriate under FTB 90-1 and resulted in an overstatement of revenues. Under FTB 90-1, 100% of revenues from separately priced extended warranties are to be deferred and recognized over the life of the contract on a straight-line basis unless the Company has sufficient experience to indicate that the costs to provide the service will be incurred other than on a straight-line basis.

The Company has sufficient experience to support that future enhancements will be incurred on other than a straight-line basis. Accordingly, LCA-Vision has restated its results to reflect the deferral of revenues associated with its lifetime acuity program as a separately priced extended warranty under FTB 90-1. LCA-Vision recognized these deferred revenues in its restated results over the periods in which the future costs of performing the enhancement procedures are expected to be incurred. Because the Company's base price generally included the right to enhancements in the first year, LCA-Vision recognizes these deferred revenues based on historical enhancement rate patterns with amortization beginning after the first anniversary of a patient's surgical date. Under the historical pattern, approximately 51% of the deferred revenue will be recognized in the second year after the patient's initial surgery.

\* \* \*

In addition to the deferral of revenues under FTB 90-1, LCA-Vision is also deferring a portion of its costs of service related to professional fees paid to the attending surgeon. Professional fees are earned when a procedure is performed. The physician receives no incremental fee for an enhancement procedure. Accordingly, a portion of the professional fee paid to the physician relates to the future enhancement procedures to be performed and qualifies for deferral under FTB 90-1 as a direct and incremental cost of the warranty contract. LCA-Vision will use the same historical

experience to amortize the deferred revenue and the deferred professional fees.

24. On May 9, 2007, the Company issued a press release entitled "LCA-Vision Reports 18% Revenue Growth for the 2007 First Quarter; Company Affirms 2007 Guidance." Therein, the Company, in relevant part, stated:

> LCA-Vision Inc. (Nasdaq: LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced financial and operational results for the three months ended March 31, 2007. All 2006 first quarter revenue and net income figures reported today reflect the restated financial results contained in LCA-Vision's Form 10-K/A for the year ended December 31, 2006, filed with the Securities and Exchange Commission (SEC) on May 8, 2007. As previously announced, the Form 10-K/A is subject to ongoing review by, and possible additional comments from, the staff of the SEC.
>
> **First Quarter Financial & Operational Highlights:**
>
> - Revenues grew 18% to approximately $78.7 million from approximately $66.8 million.
>
> - Procedure volume increased 11% to 59,101 from 53,372.
>
> - Same-store revenues grew 5%.
>
> - Net income increased 16% to approximately $10.9 million from approximately $9.4 million.
>
> - Earnings per share increased 23% to $0.54 from $0.44.
>
> - Four new LasikPlus vision centers were successfully opened in Westbury, NY; Harrisburg, PA; Green Bay, WI; and Omaha, NE.
>
> ***Steven C. Straus, LCA-Vision's Chief Executive Officer, commented, "We are pleased to report 2007 first quarter revenue growth of 18%, continued gains in market share in both new and existing markets and continued ability to consistently outperform industry growth rates. For the quarter, we grew revenues to more than $78 million, and increased procedure volume 11% to more than 59,000. Same-store revenues were up 5%, net income was up 16% and earnings per diluted share grew 23%.*** We achieved

this growth in an industry where procedure volume has been flat-to-down for the past six quarters."

Mr. Straus continued, "We successfully opened four LasikPlus vision centers in the first quarter, all in new markets. We now operate a total of 63 vision centers in 48 markets in 29 states. We plan to open eight to 11 additional centers this year. Our continued investment in expanding our store base, which also includes relocation and/or renovations of older locations, further strengthens our operations and provides significant opportunity for future growth.

\* \* \*

## Net Income & Earnings Per Share

*First quarter 2007 earnings per diluted share increased 23% to $0.54 from $0.44 in the first quarter of 2006.* First quarter 2007 net income increased 16% to approximately $10.9 million from approximately $9.4 million in the first quarter of 2006.

\* \* \*

## Cash Position

Net cash provided by operating activities increased 17% in the first quarter of 2007 to approximately $28.5 million from approximately $24.3 million in the first quarter of 2006. Cash and short-term investments increased to approximately $123.1 million as of March 31, 2007, from approximately $98.1 million as of December 31, 2006.

## Outlook

*LCA-Vision affirmed its previous guidance for the 2007 full year. The company currently expects earnings per diluted share for the full-year of 2007 to be in the range of $2.05 to $2.15 with revenue growth between 20% and 25%, compared to the originally reported 2006 revenue of $256.9 million.* We are currently testing the use of bundled warranties instead of separately priced extended warranties. This guidance assumes that we significantly reduce or eliminate the use of separately priced extended warranties in the second half of 2007, and that the effect of deferring revenues for separately priced extended warranties in the first half of 2007 is offset by additional revenues in the second half of 2007 as previously deferred revenues get amortized back into revenues. For the second quarter of 2007, we expect our marketing spending to be approximately $17 million. For the full

year 2007, we expect to spend approximately $67 million on marketing and advertising. We continue to seek more effective and efficient methods of patient acquisition. As previously disclosed, the company expects to open 12 to 15 new vision centers throughout 2007. In the first half of 2007, center openings will focus on new markets. After evaluating the results of the additional locations opened last year in Houston, Minneapolis and Chicago, the company will consider additional locations in existing markets. [Emphasis added.]

25.     The statements contained in ¶¶ 21 – 24 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that procedure volume at existing stores had significantly declined; (2) that overall growth was solely coming from new store openings; (3) that the Company was operating under defective assumptions about its marketing budget and deferred revenue; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in a reasonable basis when made.

### The Truth Begins to Emerge

26.     On July 31, 2007, the Company shocked investors when it issued a press release entitled "LCA-Vision Reports 16% Revenue Growth for the Second Quarter of 2007; Full-Year 2007 Financial Guidance Revised."  Therein, the Company, in relevant part, stated:

LCA-Vision Inc. (Nasdaq:LCAV), a leading provider of laser vision correction services under the LasikPlus brand, today announced financial and operational results for the three months and six months ended June 30, 2007.

**Second Quarter 2007 Financial and Operational Results**

- Revenues increased 16% to $69.7 million from $60.3 million in the second quarter of 2006.

- Procedure volume increased 3% to 48,668 from 47,308 in the second quarter of 2006.

- *Net income and earnings per diluted share were $7.4 million and $0.36, compared with $8.0 million and $0.37 in the second quarter of 2006.*

\* \* \*

*"In the second quarter of 2007, we reported 16% revenue growth with a modest increase in procedure volume," said Steven C. Straus, LCA-Vision's Chief Executive Officer. "We are not satisfied with our financial and operational results, primarily due to the decline in same-store procedure volume and rising patient acquisition costs.* We expect several factors to re-accelerate earnings and revenue growth in the second half of this year. *Among these, we are implementing a number of major marketing initiatives* that we believe will provide improved performance in the second half of this year and into 2008, with the largest impact expected in the first quarter of 2008."

*"In some of our more established markets, we are remodeling or relocating our LasikPlus vision centers with an aim toward improving same-store performance. So far this year, we have remodeled nine vision centers and have plans to remodel five more, and will relocate two vision centers by the end of this year," added Mr. Straus.* "We also expect to add new managed care provider agreements in the second half of this year. These new provider agreements should drive incremental procedure volume in existing markets and help launch our targeted new markets."

Mr. Straus continued, "Opening new vision centers is a component of our future growth and profitability. During the first six months of 2007, we opened nine LasikPlus vision centers compared with three openings in the first six months of 2006. Earlier this month, we announced the opening of a LasikPlus vision center in Fresno, California. Year-to-date, we have opened 10 new vision centers, which represents a 17% increase in our vision center base since December 31, 2006. We are on track to meet our goal of opening a total of 12 to 15 vision centers this year, and remain focused on strategically expanding the LasikPlus footprint throughout the United States, while continuing to deliver high-quality results to our patients at an affordable price."

**Revenues and Operating Income**

Revenues grew 16% to $69.7 million in 2007's second quarter from $60.3 million in 2006's second quarter. Total procedure volume increased 3% in 2007's second quarter to 48,668 from 47,308 procedures performed in 2006's second quarter. In the

second quarter of 2007, same-store procedure volume at vision centers located in the United States decreased by approximately 8% from the second quarter of 2006. *Operating income was $10.0 million in 2007's second quarter compared with $12.4 million in 2006's second quarter. Operating income for the second quarter of 2007 was lower than the second quarter of 2006 primarily as a result of 16 more vision centers in operation as of June 30, 2007, compared with June 30, 2006, and higher marketing expenditures to support new and existing markets.*

### Net Income and Earnings Per Share

*Second quarter 2007 net income and earnings per diluted share were $7.4 million and $0.36, compared with $8.0 million and $0.37 in the second quarter of 2006.*

### Effect of the Change in Our Accounting for Deferred Revenues on Financial Results

In the second quarter of 2007, LCA-Vision deferred $7.9 million of revenue from the sale of separately priced extended warranties. The amortization of deferred revenue from prior periods was $7.0 million in the most recent quarter. In the second quarter of 2006, the amount of deferred revenue was $9.9 million and the amortization of deferred revenue from prior periods was $4.7 million. An analysis of the effect of changes in deferred revenues and deferred professional fees on revenues and operating income is included in the attached table "Effect of the Change in Our Accounting for Deferred Revenues on Financial Results." Management utilizes this information as a means of measuring performance that adjusts for the non-cash impact of the accounting for separately priced extended warranties and believes that including this additional disclosure is meaningful to investors for the same reason.

On June 15, 2007 LCA-Vision eliminated the use of separately priced extended warranties. As a result of the new pricing strategy, the company will no longer defer revenues for its warranties, but will continue to amortize prior revenues and professional fees that were deferred as of June 30, 2007. The company expects the amortization of deferred revenues in the second half of 2007 to be $14.5 million and the net effect to reported earnings per diluted share to be about $0.21 for the full-year of 2007.

\* \* \*

### Outlook

> *LCA-Vision is revising its earnings and revenue guidance for the full-year of 2007. The company now expects earnings per diluted share to be in the range of $1.90 to $2.00, and revenues between $308.0 million to $315.0 million, which includes the impact of deferred revenues. For the third quarter of 2007, marketing spend is expected to be approximately $17.5 million.* [Emphasis added.]

27. On this news, the Company's shares declined $7.48 per share, or 17.4 percent, to close on July 31, 2007 at $35.51 per share, on unusually heavy trading volume.

28. On August 31, 2007, The Motley Fool released an article entitled "LCA-Vision Investors Blindsided," which in relevant part, stated:

> *Egads, was that ever bad!*
>
> In last week's Foolish Forecast for Q2 earnings at LCA-Vision (Nasdaq: LCAV), *I was puzzled that analysts predicted both double-digit sales growth and a double-digit earnings decline for the LASIK specialist. It just didn't make sense, especially in light of CEO Steven Straus's recent assurance that the company was on track to achieve 20%-plus sales growth and better than 50% profit growth this year. Something was amiss.*
>
> *And how. Reviewing Tuesday's results, it appears that the analysts ultimately weren't pessimistic enough. The numbers were simply abysmal:*
>
> - Sales rose only 6% (or 16%, based on management's restatement of Q2 2006 results).
>
> - *Procedure volume increased an anemic 3%, with all of the growth coming from new store openings. Existing stores dragged down the final number with an 8% drop in same-store sales.*
>
> - Per-share profits fell by a penny to $0.36.
>
> Little wonder that Straus pronounced himself "not satisfied" with these numbers. They could only please a short seller. (In fact, with the share price down 21% in 48 hours, they probably *did* please the shorts.)
>
> \* \* \*

**The good news**

Even the good news was bad at LCA this quarter. Straus pointed out that while profits were down, cash flow was up 14*%. **Good news? Not really. The 14% number was for year-to-date cash flow, and it relied heavily on last quarter's 17% growth. In Q2, cash flow actually performed worse than GAAP profits -- down 35% year over year from last year's $8 million.**

**The not-yet news**

Putting it all together, LCA decided to lower its forward earnings guidance by roughly 7%, to a midpoint of $1.95 per share. (The last time we checked, the midpoint was $2.10.) *How confident should you be that LCA will meet its latest and less-than-greatest target?*

Well, LCA has earned $0.90 per share already, but the year's more than half over. So *unless management fulfills its promise to reenergize growth next quarter, I'd put the likelihood of hitting the latest earnings target somewhere south of 50%.* [Emphasis added.]

29.     The following day, the Company's shares declined an additional $2.11 per share, or almost 6 percent, to close on August 1, 2007 at $33.40 per share, again on heavy trading volume.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased LCA's securities between February 12, 2007 and July 30, 2007, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, LCA's securities were actively traded on the NASDAQ. While the exact number of Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by LCA or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

33. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of LCA; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

35. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

36.     The market for LCA's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, LCA's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired LCA's securities relying upon the integrity of the market price of LCA's securities and market information relating to LCA, and have been damaged thereby.

37.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of LCA's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about LCA's financial well-being and prospects. These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of LCA and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

39.　Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

40.　During the Class Period, Plaintiffs and the Class purchased LCA's securities at artificially inflated prices and were damaged thereby. The price of LCA's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.　As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding LCA, their control over, and/or receipt and/or modification of LCA's allegedly materially misleading misstatements and/or their

24

associations with the Company which made them privy to confidential proprietary information concerning LCA, participated in the fraudulent scheme alleged herein.

42.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 35,989 shares of the Company's stock for gross proceeds of $1,520,016, including over $1.4 million in gross proceeds received by Defendant Joffe, the Company's COO.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| March 7, 2007 | Joffee, Craig P. R. | 4,829 | $42.61 - $42.62 | $206,000 |
| March 6, 2007 | Joffee, Craig P. R. | 30,000 | $42 - $42.28 | $1,264,000 |
| March 2, 2007 | Whiting, David W. | 110 | $41.99 | $4,618 |
| March 2, 2007 | Joffee, Craig P. R. | 200 | $41.99 | $8,398 |
| February 27, 2007 | Gutfreund, John H. | 850 | $43.74 - $43.76 | $37,000 |
| | **TOTAL:** | **35,989** | | **$1,520,016** |

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

43.     At all relevant times, the market for LCA's securities was an efficient market for the following reasons, among others:

(a)     LCA's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, LCA filed periodic public reports with the SEC and the NASDAQ;

(c)     LCA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     LCA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for LCA's securities promptly digested current information regarding LCA from all publicly-available sources and reflected such information in the price of LCA's securities. Under these circumstances, all purchasers of LCA's securities during the Class Period suffered similar injury through their purchase of LCA's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of LCA who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

46.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase LCA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LCA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LCA's financial well-being and prospects, as specified herein.

50.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LCA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LCA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LCA's securities during the Class Period.

51.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

52.     The defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LCA's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LCA's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of LCA's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired LCA's securities during the Class Period at artificially high prices and were damaged thereby.

54. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that LCA was experiencing, which were not disclosed by defendants, Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their LCA securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
#### Violation of Section 20(a) of
#### The Exchange Act Against the Individual Defendants

57.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of LCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

59.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.    As set forth above, LCA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  October 1, 2007

Respectfully submitted,

STRAUSS & TROY

_____
Richard S. Wayne (0022390)
Thomas P. Glass (00062832)
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio  45202
Telephone:  (513) 621-2120
(513) 629-0426 (fax)
E-mail: rswayne@strausstroy.com

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Rd.
Radnor, PA 19087
Telephone: (610) 667-7706
(610) 667-7056 (fax)
E-mail: skaskela@sbtklaw.com


Attorneys for Plaintiffs


1369507_1.DOC

CERTIFICATION

I, (print name) _Spencer & Jean_ ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

       1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

       2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

       3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

       4.    Plaintiff's purchase and sale transaction(s) in the LCA-Vision, Inc. (Nasdaq: LCAV) security that is the subject of this action during the Class Period is/are as follows:

PURCHASES

| Buy Date | Shares | Price per Share |
|---|---|---|
| 2/12/07 | 100 | 46.42 |
| 2/12/07 | 100 | 46.42 |
| 2/12/07 | 300 | 45.96 |
| | | |
| | | |
| | | |

SALES

| Sell Date | Shares | Price per Share |
|---|---|---|
| 2/13/07 | 500 | 46.05 |
| | | |
| | | |
| | | |
| | | |
| | | |

Please list additional transactions and/or related securities (options, bonds, or preferred stock) on a separate piece of paper, if necessary.

       5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

       6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

       7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed this _24th_ day of _September_, 200_7_.

_____          _Spencer Lin / Jean Lin_
Signature                               Print Name